IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TIMOTHY JOEL PARSONS                    Case No. 6:12-cv-01693-MA

              Plaintiff,              OPINION AND ORDER

   v.

COMMISSIONER SOCIAL SECURITY
ADMINISTRATION,

           Defendant.

KATHRYN TASSINARI
ROBERT A. BARON
474 Willamette, Suite 200
Eugene, OR 97401

     Attorneys for Plaintiff

S. AMANDA MARSHALL
United States Attorney
District of Oregon
ADRIAN L. BROWN
Assistant United States Attorney
1000 S.W. Third Ave., Suite 600
Portland, OR 97204

SARAH L. MARTIN
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Suite 2900 M/S 221A
Seattle, WA 98104-7075

     Attorneys for Defendant

1 - OPINION AND ORDER

MARSH, Judge

Plaintiff Timothy Joel Parsons brings this action for judicial review of a final decision of the Commissioner of Social Security denying his application for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C §§ 1381-1385. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). For the reasons that follow, I reverse the final decision of the Commissioner, and remand this action for further administrative proceedings.

## PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for SSI on December 21, 2007. Plaintiff again protectively filed for SSI February 9, 2009, alleging disability beginning June 1, 2003. Plaintiff's claim was denied initially and upon reconsideration. Plaintiff filed a request for a hearing before an administrative law judge (ALJ). An ALJ held hearings on November 4, 2010 and April 5, 2011, at which plaintiff appeared with his attorney and testified. A vocational expert also appeared and testified at each hearing. At the November 4, 2010 hearing, plaintiff's attorney requested that plaintiff's initial SSI application be re-opened and he amended his alleged onset date to December 21, 2007. On April 13, 2011, the ALJ issued an unfavorable decision. The Appeals Council denied plaintiff's request for review on July 19, 2012.

The ALJ's decision therefore became the final decision of the Commissioner for purposes of review.

## FACTUAL BACKGROUND

Plaintiff was born in 1959 and was 49 years old on the date his 2009 application was filed and was a "younger individual" under the regulations.  On the date of the ALJ's decision, plaintiff's age category had changed to "closely approaching advanced age." Plaintiff completed 11 years of school, obtained a GED.  Plaintiff has past relevant work as a campground attendant, and also has been employed as a boat painter, a roofer, a shrimp picker and a chef. Plaintiff alleges disability based on degenerative disc disease, sciatica, and chronic obstructive pulmonary disease (COPD).

## THE ALJ'S DISABILITY ANALYSIS

The Commissioner has established a five-step sequential process for determining whether a person is disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. § 416.920.  Each step is potentially dispositive.  The claimant bears the burden of proof at steps one through four.  Bray v. Commissioner of Soc. Sec. Admin., 554 F.3d 1219, 1222 (9th Cir. 2009); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  The burden shifts to the Commissioner at step five to show that a significant number of jobs exist in the national economy that the claimant can perform. Yuckert, 482 U.S. at 141-42.

At step one, the ALJ found that plaintiff has not engaged in substantial gainful activity since February 9, 2009, the application date. See 20 C.F.R. §§ 416.920(b), 416.971 et seq.

At step two, the ALJ found that plaintiff had the following medically determinable severe impairments: status post lumbar surgeries and marijuana abuse disorder. See 20 C.F.R. § 416.920(c).

At step three, the ALJ found that plaintiff does not have an impairment or combination of impairments that meets or medically equals a listed impairment. See 20 C.F.R. §§ 416.920(d), 416.925, 416.926.

The ALJ assessed plaintiff with a residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 416.967(b), except that claimant can stand for four hours and sit for three hours at any one time for a total of six hours each in an eight hour workday; he cannot climb ropes or ladders but can occasionally perform all other postural movements; he can withstand occasional exposure to heights, hazards, and machines due to marijuana abuse; he cannot walk a block at a reasonable pace on rough or uneven ground; he can withstand occasional extreme cold; and can withstand frequent but not continuous vibration. See 20 C.F.R. §§ 416.927, 416.929.

At step four, the ALJ found that plaintiff is unable to perform any past relevant work. See 20 C.F.R. § 416.965.

At step five, the ALJ found that considering his age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform. See 20 C.F.R. §§ 416.969, 416.969(a). Accordingly, the ALJ concluded that plaintiff is not disabled within the meaning of the Act.

## ISSUES ON REVIEW

Plaintiff contends that the ALJ made several errors: (1) improperly discrediting the opinion of James Suiter, his treating nurse practitioner; (2) improperly discrediting the opinion of reviewing physician Robin Rose, M.D.; (3) improperly discrediting his testimony; and (4) failing to demonstrate that plaintiff retains the ability to perform other work in the national economy at step five.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.; Valentine v. Comm'r Soc. Security Admin., 574 F.3d 685, 690 (9th Cir. 2009). The court must weigh all the evidence, whether it

supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, even if the evidence is susceptible to more than one rational interpretation. Batson v. Comm'r of Soc. Security Admin., 359 F.3d 1190, 1193 (9th Cir. 2004); Andrews, 53 F.3d at 1039-40. If the evidence supports the Commissioner's conclusion, the Commissioner must be affirmed; "the court may not substitute its judgment for that of the Commissioner." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001); Batson, 359 F.3d at 1193.

## DISCUSSION

### I.   Plaintiff's Medical Record

The record before me shows plaintiff visited the Springfield, Oregon emergency room (ER) three times on December 11, 17, and 28, 2007. These records show that plaintiff had recently moved to Springfield from Arizona, and that he was without insurance. During the December 11, 2007 ER visit, treatment providers noted an "intense spasm palpable in the lumbar region bilaterally." Tr. 343. Plaintiff was encouraged to follow up immediately with a primary care physician, and was given Percocet and Valium. Tr. 343-44. The December 11, 2007 ER treatment notes clearly demonstrate an objective basis for plaintiff's pain complaints.

During the December 17, 2007 visit, plaintiff described that his pain recently had exacerbated, with his left leg feeling very

6 - OPINION AND ORDER

hot and "fire-like," and the doctor noted plaintiff moved slowly during the examination. Tr. 341-42. Plaintiff stated that he had not yet seen a doctor, and had no insurance. Plaintiff again was given Percocet and Valium, and was counseled that the ER cannot accommodate pain management. During his third visit on December 28, 2007, plaintiff arrived by ambulance after falling down and injuring his back and left buttock. Tr. 338. Plaintiff stated that he had seen his primary care physician and was scheduled for an MRI. According to the ER pain policy, he was given two Vicodin and advised to follow up with his primary care physician. Id.

Consistent with plaintiff's explanation to the ER doctors, his medical records show that plaintiff established care with Beth Blumenstein, M.D., on December 21, 2007. Tr. 350. Dr. Blumenstein's treatment notes indicate that plaintiff was in tears, and plaintiff described that he had experienced intermittent low back pain for years, with a sudden exacerbation. Plaintiff reported to Dr. Blumenstein fire-like pain running down his left leg into his foot. Dr. Blumenstein noted that plaintiff had been without any health maintenance for years, and that an MRI was needed. Plaintiff stated that he could not afford an MRI, and Dr. Blumenstein advised him to apply for Bridge Assistance, a charity care program, and she prescribed Percocet and Valium. Tr. 350-51. Id. Thus, contrary to the ALJ's findings, plaintiff's three ER

visits and his statements to Dr. Blumenstein and the ER physicians were consistent.

An MRI was performed on January 14, 2008, and showed that plaintiff had multilevel neural foraminal narrowing without central canal stenosis.  Tr. 352.  Because plaintiff was describing pain out of proportion to the MRI results, Dr. Blumenstein referred him to Christopher G. Miller, M.D., a neurosurgeon.

On May 6, 2008, plaintiff had an initial consultation with Dr. Miller, who performed an MRI that day.  Dr. Miller observed that the MRI showed plaintiff has "advanced degenerative disc collapse at L5-S1, a little less so at L4-5, but he has severe foraminal stenosis bilaterally, worse on the left at L5-S1 with a broad-based central bulge and actually even some herniation out in the foramen there."  Tr. 378.  Dr. Miller found that plaintiff's pain had progressed to the point that plaintiff cannot sit comfortably, standing and walking produce intense pain, noting "[i]t is clearly claudication," and that "90% of his symptoms are actually leg pain and claudication, consistent with the stenosis."  Id.  Dr. Miller recommended decompression surgery instead of a posterior lumbar interbody fusion (PLIF) because plaintiff was generally in poor health.  Dr. Miller noted that plaintiff would not get 100 percent relief from the decompression and would likely need an additional surgery, and that plaintiff was without insurance.  Tr. 379.

On August 21, 2008, plaintiff was brought to the ER via ambulance after falling. Tr. 364. Plaintiff informed the ER physician that surgery had been recommended, but he wanted a second opinion, and plaintiff presented his January 2008 MRI results. Plaintiff was given narcotics and advised to follow up with a primary care physician.

In September 2008, plaintiff established care with Sarah Sheffield, a family nurse practitioner. Tr. 428. Ms. Sheffield's treatment notes indicate that plaintiff had seen Dr. Miller, who was recommending surgery. Plaintiff, who has a history of alcohol abuse, admitted to Ms. Sheffield that he had recently started drinking, up to four drinks a day. Ms. Sheffield prescribed gabapentin. At a follow up visit two weeks later, plaintiff continued to complain of pain in the left lower extremity, with tingling, burning and numbness. Tr. 427. Ms. Sheffield noted that plaintiff was in "obvious discomfort" and upon exam discovered "obvious neurologic issues in the [left lower extremity], with atrophy of both thigh and calf." Id. Ms. Sheffield's treatment notes indicate that she was coordinating with Dr. Miller to obtain insurance coverage for plaintiff's recommended surgery. Tr. 426-27. When plaintiff met with Ms. Sheffield in December 2008, she provided "lengthy reassurances" to allay plaintiff's fear of surgery.

In January of 2009, Dr. Miller performed a spinal decompression surgery in attempt to relieve some of plaintiff's pain. Although plaintiff experienced some initial improvement following surgery, the results were not long lasting. On March 31, 2009, plaintiff met with Sean T. Rabacal, Dr. Miller's Physician Assistant. Mr. Rabacal observed that plaintiff was still "in a fair amount of pain" diffuse across his back and radiating down both legs and that the claudication had returned. Tr. 389. Mr. Rabacal recommended waiting two more months to determine if plaintiff's body would further heal, and plaintiff's Percocet prescription was refilled. Id.

On May 5, 2009, Sharon B. Eder, M.D., a nonexamining physician, reviewed plaintiff's medical records and completed a physical residual functional capacity assessment. Dr. Eder commented that as of January 20, 2009, plaintiff complained of years of progressive problems with his back and legs, with pain radiating down his left leg, that standing produces intense pain, sitting is uncomfortable, and walking is worse. Tr. 388. Dr. Eder also observed that plaintiff's MRI confirms his advanced degenerative disc disease, that he is stenotic at L5-S1 and L4-5, and that "he is disabled, cannot work." Dr. Eder also noted that in February of 2009, plaintiff was three weeks out from decompression, that plaintiff could sit and stand comfortably, and his severe burning in his left leg was gone. Tr. 388. Based on

these records, Dr. Eder concluded that plaintiff was partially credible about his limitations, and provided a "projected RFC" for the healing process, indicating that plaintiff could be expected to perform light work by February 9, 2010.

At a follow up visit with Dr. Miller on June 2, 2009, plaintiff continued to complain of pain. Dr. Miller examined plaintiff, noting plaintiff had full strength in his legs, but was tender in the buttocks. Dr. Miller then ordered an MRI, which showed post-surgical changes with "moderately severe bilateral foraminal stenosis L5-S1 and moderate right L4 foraminal stenosis." Tr. 390. Dr. Miller explained that "[h]is MRI scan really looks like he is still very tight in the left L5-S1 foramen" and it looks like he has a broad-based spur in the foramen." Continuing, Dr. Miller observed that plaintiff has "such extensive collapse at that level, that I doubt if there is much disc." Dr. Miller recommended another decompression surgery as quickly as possible to attempt to relieve plaintiff's pain. Tr. 392. In September 2009, Dr. Miller performed another decompression surgery.

Again, after the September 2009 surgery, plaintiff experienced some initial relief, but plaintiff reported a flare up of symptoms. In December of 2009, plaintiff noted his pain was better overall, but he still had diffuse low back pain. Tr. 395. At a follow up visit in February of 2010, Dr. Miller recommended a two-level PLIF.

Tr. 394. Dr. Miller agreed to perform the surgery if approved by insurance.

On September 21, 2009, plaintiff established care with James Suiter, a nurse practitioner, for follow up care after a bicycle crash injured three ribs. Tr. 417. In February of 2010, Mr. Suiter's chart notes show that plaintiff appeared uncomfortable sitting in a chair, he had a full range of motion and strength in his lower extremities, and that plaintiff complained of significant back pain. Tr. 416. Mr. Suiter diagnosed chronic pain syndrome with continuous opioid dependency, and depression, insomnia and anorexia due to his pain. Mr. Suiter's notes reflect that plaintiff was no longer using alcohol, but was using marijuana. Id. Mr. Suiter concurred with Dr. Miller's surgical recommendation.

A March 10, 2010 MRI showed moderate to severe bilateral foraminal stenosis at L5-S1, with marked disc narrowing and dessication at L4-5 and L5-S1. Tr. 437.

On April 4, 2010, plaintiff met with Mr. Suiter, concerned about his pain management. Plaintiff described that surgery had been denied and that Dr. Miller could no longer prescribe pain medications. Mr. Suiter discussed pain options with plaintiff, noting that the clinic pain program was closed and that he would not qualify because he smokes marijuana. Tr. 413. Mr. Suiter's notes reflect that plaintiff would obtain medical marijuana from

the Oregon Compassion/Pain Center.  Tr. 412.  In May of 2010, Dr. Miller attempted to set up plaintiff's third surgery, but insurance denied it.    Consistent  with  plaintiff's  reports,  Dr.  Miller indicated that at that time, he could not treat plaintiff since he was  not  a  surgical  candidate,  and  that  plaintiff  would  need  a different treatment provider for pain management.  Tr. 436.

In June of 2010, plaintiff again saw Mr. Suiter for a follow up on his pain management.  Mr. Suiter noted plaintiff's "chronic pain  syndrome  with  continuous  opioid  dependency  which  has  been significant.    He  has  had  very  poor  response  to  withdrawal  from narcotics in the past" due to his degenerative disc disease.  Tr. 462.  Plaintiff indicated he would be willing to stop using medical marijuana if necessary to get into a pain management program.  Tr. 463.

On August 6, 2010, plaintiff saw Peter Petricelli, M.D., for his  pain,  and  requested  narcotics.    Dr.  Petricelli  noted  that plaintiff had been rejected from one pain clinic because he tested positive for marijuana, and another for being uncooperative.  Dr. Petricelli  was  unwilling  to  prescribe  narcotics,  and  prescribed Ultram, a non-narcotic, instead. Tr. 458.

On August 20, 2010, plaintiff again saw Mr. Suiter for pain, and to attempt to get his surgery approved.  Mr. Suiter concurred with Dr. Miller's assessment and the need for surgery.  Plaintiff admitted that he was using marijuana and alcohol for his increased

pain.    Plaintiff stated the Ultram was not working, and that his problems persisted.    Eventually, plaintiff's third surgery was approved by insurance.

On October 30, 2010, Dr. Miller performed the PLIF surgery. At a follow up visit in December of 2010, Dr. Miller noted that plaintiff was doing very well, noting that most of his pain was gone, and that plaintiff had cut back dramatically on his pain medications. On March 1, 2011, Dr. Miller again examined plaintiff and noted that plaintiff was complaining of diffuse pain in his low back, but that plaintiff was progressing "satisfactorily."    Dr. Miller noted that plaintiff should remove his brace, and begin light stretching exercises.    Dr. Miller opined that plaintiff's recovery would take more than a year, and that by summer he should see considerable improvement.    Tr. 515.

On November 15, 2010, Robin Rose M.D., conducted a comprehensive review of plaintiff's medical records and opined that plaintiff was capable of standing and walking for three hours, with the ability to change position, and that plaintiff could sit for four hours, with the need to change position every 30 minutes, and that plaintiff could lift 10 pounds frequently and 20 pounds occasionally.    Tr. 477-94.    Additionally, Dr. Rose indicated that light and sedentary work may be difficult due to unpredictable flares of pain, and that plaintiff would miss more than two days of work per month.    Tr.  494.    On November 23, 2010, Dr. Rose opined

14 - OPINION AND ORDER

that plaintiff has been unable to perform light or sedentary work since December 21, 2007.

On January 7, 2011, Seth Kagan, M.D., an examining physician, performed a physical capacity evaluation of plaintiff.  Tr. 501. Dr. Kagan observed that plaintiff was able to transfer from the chair to the exam table easily, remove his shoes without difficulty, sit comfortably, and noted that plaintiff limped with the right knee seeming to buckle.  Tr. 503-04.  Dr. Kagan diagnosed probable neuro foraminal stenosis, and opined that plaintiff could stand and walk for six hours, could sit without limitation, and could lift 100 pounds occasionally and 50 pounds frequently.

In the decision, the ALJ gave significant weight to Dr. Miller's 2011 opinion and some weight to Dr. Kagan's opinion.  The ALJ also gave significant weight to Dr. Eder's opinion.

////

////

III.  **The ALJ's Evaluation of the Medical Evidence**

    A.    **Standards**

An ALJ may reject a treating physician's opinion when it is inconsistent with the opinions of other treating or examining physicians if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are supported by substantial evidence in the record.  Taylor v. Comm'r of Soc. Sec. Admin., 659 F.3d 1228, 1232 (9th Cir. 2011).  In general, the opinion of a

15 - OPINION AND ORDER

treating physician is given greater weight than the opinions of other physicians.  See Orn v. Astrue, 495 F.3d 625, 631-32 (9th Cir. 2007)(treating physician's opinion is given controlling weight if it is well-supported and not inconsistent with the other substantial evidence in the record).

A nonexamining physician is one who neither examines nor treats the claimant.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician."  Taylor, 659 F.3d at 1233 (quoting Lester, 81 F.3d at 831).  When a nonexamining physician's opinion contradicts an examining physician's opinion and the ALJ gives greater weight to the nonexamining physician's opinion, the ALJ must articulate specific and legitimate reasons supported by substantial evidence for doing so.  See, e.g., Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008).  A nonexamining physician's opinion can constitute substantial evidence if it is supported by other evidence in the record.  Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).

**B.  James E. Suiter, Nurse Practitioner**

Plaintiff argues that the ALJ erred by failing to discuss Mr. Suiter's opinion.  The Commissioner acknowledges the ALJ failed to address Mr. Suiter's records directly, but alleges the error is

harmless.   I conclude the ALJ's failure to discuss Mr. Suiter's opinion and evidence is harmful error.

Under the social security regulations governing the weight to be accorded to medical opinions, "acceptable medical sources" include licensed physicians and licensed psychologists, but not nurse practitioners. 20 C.F.R. § 416.913(a), (d)(1).    Nurse practitioners are deemed to be "other sources."   Id.   "Other" medical sources may not establish the existence of a medically determinable impairment, but, the information from other sources may provide insight into the severity of a claimant's impairments and ability to work, especially where the evidence is complete and detailed.   See SSR 06-03p, available at 2006 WL 2329939, *4-5.

Because Mr. Suiter was an "other source" under the regulations, the ALJ was required to provide a germane reason for discounting Mr. Suiter's opinion.   See, e.g., Bruce v. Astrue, 557 F.3d 1113, 1115-16 (9th Cir. 2009)(explaining standard for lay witness testimony); Turner v. Astrue, 613 F.3d 1217, 1223-24 (9th Cir. 2010).   Additionally, an ALJ must explain why "significant probative" evidence has been rejected.   Vincent on Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

The Commissioner's suggestion that Mr. Suiter's opinion and treatment records were not sufficiently probative to warrant the ALJ's discussion is meritless. Mr. Suiter began treating plaintiff in September of 2009, continuing into 2010. An October 20, 2010,

treatment note shows plaintiff's diagnosis of "chronic pain syndrome with continuous opioid dependency secondary to pain/degenerative disc disease." Mr. Suiter observed that plaintiff had difficulty walking, noting that plaintiff was barely ambulatory, and he opined that plaintiff is "basically disabled due to his extensive back pain issues." Tr. 451. Mr. Suiter's treatment notes indicate that plaintiff's condition was essentially unchanged from at least June of 2010 through October of 2010. Tr. 451, 455, 462. As discussed above, Mr. Suiter concurred with Dr. Miller's opinion that plaintiff required a PLIF to obtain pain relief, was coordinating care with Dr. Miller, and assisted in obtaining approval for plaintiff's third surgery. Mr. Suiter's chart notes consistently indicate that plaintiff was extremely limited by his severe back symptoms, and that his extreme pain was impairing his ability to sleep and eat. Mr. Suiter's observations about plaintiff's impairments and his functional limitations constitute significant probative evidence that the ALJ could not reject without comment. Thus, the ALJ's failure to discuss and weigh this significant probative evidence was error.

I reject the Commissioner's suggestion that the error was harmless because Mr. Suiter's 2010 opinion was inconsistent with Dr. Miller's March 2011 opinion. The Commissioner's argument is specious.

In March of 2011, Dr. Miller stated that plaintiff should experience "significant improvement" in his symptoms by summer of 2011 following plaintiff's third surgery. While the ALJ purported to give Dr. Miller's 2011 opinion "significant weight," the ALJ failed to account for Dr. Miller's earlier opinions recommending surgery. More critically, the ALJ omitted entirely any discussion of Dr. Miller's 2008 MRI results showing advanced degenerative disc disease, severe bilateral foraminal stenosis, disc herniation, and claudication, or the 2009 and 2010 MRI results showing post-operative changes with moderately severe bilateral foraminal stenosis. Tr. 378, 390, ___. Plaintiff's degenerative disc disease and chronic pain did not remain static through the relevant adjudicatory period. As the treating specialist who performed the bulk of the objective tests verifying plaintiff's complaints, Dr. Miller's opinions were entitled to the greatest weight. Orn, 495 F.3d at 1224. The ALJ's failure to failure to credit Dr. Miller's various opinions or to provide specific reasons for discounting them was error.

C.  **Robin Rose, M.D.**

Dr. Rose opined that plaintiff could not work for eight hours a day, would be absent from work at least two days a month due to unpredictable pain, and has been unable to perform sedentary or light work since December 21, 2007. The ALJ gave the opinion of Dr. Rose, a nonexamining physician, little weight because it was

19 - OPINION AND ORDER

not supported by medically acceptable clinical and laboratory diagnostic techniques, she was a reviewing physician, the opinion was inconsistent with other substantial evidence in the record, and because she is not a neurologist.

Plaintiff argues that Dr. Rose's medical opinion is consistent with the opinion of Dr. Miller, and thus, should be given more weight than the opinion of Seth Kagan, M.D., an examining physician. The Commissioner contends that Dr. Rose's opinion was contradicted by Dr. Kagan and nonexamining agency physicians, and therefore, the ALJ reasons for rejecting Dr. Rose's opinion were sufficient.

I disagree that Dr. Kagan's opinion provides a basis for rejecting Dr. Rose's opinion in light of the record as a whole. Dr. Kagan, who examined plaintiff after his third surgery, diagnosed probable neuro foraminal stenosis, and opined that plaintiff could perform work at the heavy exertional level. However, Dr. Kagan's opinion that plaintiff could perform heavy work is not internally consistent with his observation that plaintiff could not walk a block at a reasonable pace on an uneven surface. Tr. 507-12. Moreover, Dr. Kagan's opinion that plaintiff could perform heavy work after three back surgeries is simply not supported by substantial evidence in the record. Lastly, Dr. Kagan's opinion in January of 2011 fails to take into account plaintiff's condition throughout the relevant period.

Furthermore, I am not persuaded by the Commissioner's contention that Dr. Rose's opinion is contradicted by Dr. Eder. Dr. Eder reviewed plaintiff's medical records in May of 2009, and projected that based on plaintiff's initial improvement after his first surgery, plaintiff would be able to perform light work by February of 2010. However, Dr. Eder also indicated that in January of 2009, plaintiff was disabled and that his pain complaints were verified by MRI findings. Dr. Eder's 2009 opinion did not consider plaintiff's subsequent medical history, including continued moderately severe bilateral stenosis and additional surgeries. Thus, based the record as a whole, the ALJ has not provided specific and legitimate reasons for rejecting Dr. Rose's opinion.

I conclude that Dr. Rose's opinion is consistent with the various opinions of Dr. Miller and Mr. Suiter, and is consistent with the medical record as a whole.

## III. **Plaintiff's Credibility**

To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must perform two stages of analysis. 20 C.F.R. § 416.929. The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008); Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996). At the second stage of the credibility

analysis, absent affirmative evidence of malingering, the ALJ must provide clear and convincing reasons for discrediting the claimant's testimony regarding the severity of the symptoms. Carmickle v. Comm'r Soc. Security Admin., 533 F.3d 1155, 1166 (9th Cir. 2008); Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).

The ALJ must make findings that are sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. Tommasetti, 533 F.3d at 1039; Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002); Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995). Factors the ALJ may consider when making such credibility determinations include the objective medical evidence, the claimant's treatment history, the claimant's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence. Tommasetti, 533 F.3d at 1039.

At the November 4, 2010 hearing, plaintiff appeared in a wheelchair because the hearing was held just five days following his third back surgery. Plaintiff testified that he was taking Oxycodone, Enocet and Soma following his surgery. Plaintiff described that he started experiencing back pain in 2007, and that at that time, he could control his pain with one Oxycodone per day. Tr. 51. Plaintiff stated that in 2008, he was lying on the couch

most of each day trying to get comfortable. Plaintiff testified that due to extreme pain he cannot eat and that he sleeps only four hours a night.

At the April 5, 2011 hearing, plaintiff testified that he had cut back to 50 Oxycodone per week (down from 100), and was taking medication for his COPD and heartburn. Plaintiff testified that he weighed around 130 pounds, up from 113 pounds, because he was using marijuana three times a day as an appetite stimulant, and that he had used marijuana that morning. Plaintiff stated that he could walk one block before his back starts to hurt, and that he lays down for most of the day. Plaintiff stated that he does not have a medical marijuana card because he cannot afford it. Plaintiff testified that he would be re-evaluated by Dr. Miller in the summer of 2011.

In the decision, the ALJ found that plaintiff was not entirely credible because he "consistently misled medical practitioners about his drug and alcohol abuse, has exhibited narcotic seeking behavior on several occasions, and has not attempted to work despite negative exam findings." Tr. 17. The ALJ also discredited plaintiff because his activities of daily living were inconsistent with his allegations of pain. I conclude that based on the record as a whole, the ALJ's credibility findings do not reach the clear and convincing standard.

First, the ALJ's conclusion that plaintiff had "negative exam findings" is not supported by substantial evidence in the record. On the contrary, as detailed above, plaintiff's medical records, especially those of Dr. Miller, provide overwhelming objective evidence documenting plaintiff's stenosis, disc collapse, claudication, and muscle atrophy supporting his subjective pain symptoms. Based on his examination and MRI results, Dr. Miller recommended surgery in May of 2008. Due to plaintiff's fear of surgery and lack of insurance, that surgery was not performed until January of 2009. Additional MRIs performed by Dr. Miller demonstrate post-surgical changes which resulted in Dr. Miller recommending, and ultimately performing, two more surgeries in September of 2009 and October of 2010. Thus, the ALJ erred in discounting plaintiff's testimony on this basis.

Second, the ALJ's conclusion that the plaintiff "consistently misled" his treatment providers about his alcohol and marijuana use is not supported by substantial evidence. Plaintiff has a history of alcohol abuse. My review of the record shows that plaintiff was forthright about his alcohol use with his medical providers, admitting to Ms. Sheffield and Mr. Suiter that he was using alcohol for pain control. Tr. 454; 425-27. To be sure, plaintiff's increased alcohol use coincides with those periods where he was deciding whether to pursue surgery in 2008, and while he was awaiting insurance approval for a third surgery in 2010. Based on

24 - OPINION AND ORDER

the record as a whole, I conclude that the ALJ erred in discrediting plaintiff on this basis.

With respect to plaintiff's marijuana use, Mr. Suiter's treatment notes indicate that plaintiff began using marijuana in early 2010 to combat anorexia, which plaintiff developed secondary to pain. Tr. 412-414. Indeed, plaintiff's weight increased after he started using medical marijuana. On one occasion, Mr. Suiter noted that plaintiff did not give a clear answer about his marijuana usage. Tr. 463. However, the ALJ's conclusion that plaintiff consistently misled his providers is not supported by substantial evidence in the record. Even if the ALJ properly discredited plaintiff on the basis of his inconsistent reports of marijuana use, this reason does rise to the clear and convincing level based on the record before me.

Third, the ALJ erred by discrediting plaintiff based on his narcotic-seeking behavior. To be sure, this is an unfortunate case. Plaintiff's complaints of intense pain have been objectively verified by MRIs showing advanced degenerative disc disease with stenosis, disc herniation, and claudication. Two surgeries did not provide relief from plaintiff's intense pain, and as a result, plaintiff has become opioid dependent. Plaintiff reported to Mr. Suiter that the non-narcotic pain medications were ineffective. As a result of insurance denials, plaintiff endured a 13-month wait for his third surgery, using alcohol and marijuana when opiates

were not available.  However, contrary to the ALJ's suggestion, none of plaintiff's providers have denied that plaintiff experiences severe pain requiring narcotic pain management.  The case law in this Circuit indicates that seeking aggressive pain relief in the form of medication can be a normal response to pain, and may show that a claimant's testimony of debilitating pain is more credible, rather than less credible.  Orn, 495 F.3d at 638; see Bridges v. Astrue, 2012 WL 4322735, *5 (D. Or. June 5, 2012), adopted, 2012 WL 4328640 (Sept. 19, 2012)(ALJ erroneously discredited claimant for seeking additional pain medication when her prescription had run out and was not contrary to her doctor's advice).

Moreover, it is evident that the ALJ focused on plaintiff's opioid dependency and marijuana use as a basis to find him not credible and to deny benefits.  For example, the ALJ detailed instances where plaintiff was denied narcotics, and that "[h]is story was that he needed more surgery."  Tr. 18.  However, it is error for the ALJ to conclude that a plaintiff's drug or alcohol abuse precludes an award of benefits.  Rather, "an ALJ must first conduct the five-step inquiry without separating out the impact of alcoholism or drug addiction."  Bustamonte v. Massanari, 262 F.3d 949, 955 (9th Cir. 2001).  Therefore, I conclude that based on the record before me, the ALJ erred in discrediting claimant on the basis of narcotic-seeking behavior.

To the extent that the ALJ discredited plaintiff for using the emergency room to assist him with pain control and obtaining a second opinion about surgery in 2008, the ALJ also erred.  The record clearly establishes that plaintiff is without financial resources and has had limited insurance coverage throughout the period at issue.  The ALJ's failure to consider the substantial evidence of plaintiff's lack of resources or insurance to explain his behavior is erroneous.  See Orn, 495 F.3d at 638 (ALJ erred in discrediting claimant based on failure to obtain treatment when unable to afford treatment).

Finally, the ALJ's conclusion that plaintiff's activities of daily living undercut his complaints of pain are not supported by substantial evidence in the record.  In the decision, the ALJ discredited plaintiff because he is able walk his dog, garden, clean his trailer, and occasionally play pool.  On the contrary, plaintiff stated that he walks his dog one block, and that his trailer is small.  Plaintiff stated that he grows strawberries and tomatoes in elevated pots so that he does not have to bend down, and only gardens when he is able.  And, the evidence regarding plaintiff's pool playing activities is limited at best.  Sporadic performance of minimal activities is not inconsistent with disability.  See Orn, 495 F.3d at 639 (daily activities may be used to discredit a claimant where they are inconsistent with other testimony or are transferable to a work setting); Vertigan v.

<u>Halter</u>, 260 F.3d 1044, 1050 (9th Cir. 2001)(ability to carry out minimal daily activities not inconsistent with disability).

In summary, I conclude that the ALJ failed to articulate clear and convincing reasons supported by substantial evidence for discrediting plaintiff. <u>Carmickle</u>, 533 F.3d at 1160.

## IV.   **Erroneous Step Five Finding**

In step five, the Commissioner must show that the claimant can do other work that exists in the national economy. <u>Andrews</u>, 53 F.3d at 1043. The Commissioner can satisfy this burden by eliciting the testimony of a vocational expert with a hypothetical question that sets out all of the claimant's limitations that are supported by substantial evidence. <u>Tackett</u>, 180 F.3d at 1101.

In this case, the ALJ failed to properly evaluate the medical opinion evidence and failed to provide clear and convincing reasons for discrediting plaintiff's pain testimony about his symptoms, and those symptoms were erroneously excluded from the plaintiff's RFC. <u>Lingenfelter</u>, 504 F.3d at 1040. It follows that substantial evidence does not support the ALJ's step five determination, since it was based on the erroneous RFC. <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1163 (9th Cir. 2001).

## V.   **Credit As True**

After finding the ALJ erred, this court has the discretion to remand for further proceedings or for immediate payment of benefits. <u>Vasquez v. Astrue</u>, 572 F.3d 586, 593 (9th Cir. 2009);

Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000).   The issue turns on the utility of further proceedings.   A remand for an award of benefits is appropriate where there is no useful purpose to be served by further proceedings or where the record is fully developed.

The Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed." Harman, 211 F.3d at 1178.   The Court should grant an immediate award of benefits when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. Id.

Where it is not clear that the ALJ would be required to award benefits were the improperly rejected evidence credited, the court has discretion whether to credit the evidence.   Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003).   In determining whether to award benefits or remand the matter for further proceedings, the court must determine whether "outstanding issues remain in the record."

In this case, when the evidence from Mr. Suiter, Dr. Miller, Dr. Rose, and plaintiff is fully credited, plaintiff is disabled for the entire adjudicatory period.   Dr. Rose opined that plaintiff has been unable to work at the light or sedentary level since

December 21, 2007, and that as of November of 2010, plaintiff would miss more than two days of work each month. Mr. Suiter opined on October 20, 2010 that plaintiff was barely ambulatory and unable to work in his condition. Dr. Miller opined in May of 2008, that plaintiff suffered advanced degenerative disc disease, with bilateral stenosis, herniation, and claudication. Vocational Expert Mark McGowan testified at the April 5, 2011 hearing that more than one absence from work each month would eliminate competitive employment. Tr. 103. Accordingly, when the opinions of Mr. Suiter and Drs. Miller and Rose are credited, it is clear that plaintiff has been disabled since February 9, 2009, the date his SSI application was protectively filed.[1]

However, I cannot remand this case for an immediate payment of benefits because the record contains numerous references to plaintiff's opioid dependency and marijuana abuse. Here, the ALJ did not find plaintiff disabled, and thus did not reach the question of materiality concerning his drug and alcohol abuse. If a claimant is found to be disabled and the record includes evidence of drug or alcohol addiction, the ALJ must determine whether the addiction is a contributing factor that is "material" to the

---

[1]The ALJ's decision does not indicate that plaintiff's application was considered for a closed period. Thus, the question of whether plaintiff has experienced medical improvement since the ALJ's decision is not presently before me.

finding of disability. 42 U.S.C. § 423(d)(2)(C); <u>Parra v. Astrue</u>, 481 F.3d 742, 746-47 (9th Cir. 2007).

In the instant case, Mr. Suiter diagnosed opioid dependency, with poor tolerance for withdrawl. At step two, the ALJ found marijuana abuse disorder as severe impairment. At the April 5, 2011 hearing, plaintiff admitted to smoking marijuana that morning and testified that he was still taking 50 Oxycodone. Accordingly, on remand, the ALJ is instructed to make a determination about whether plaintiff's opioid dependency and marijuana abuse is a contributing factor material to his disability. When performing the drug and alcohol analysis on remand, the ALJ shall make additional step three findings, including whether plaintiff's lumbar spinal stenosis and claudication (or pseudoclaudication) meets or equals Listing 1.04. The ALJ shall contact Dr. Miller if necessary to make the additional step three findings.

<u>**CONCLUSION**</u>

Based on the foregoing, the Commissioner's decision is REVERSED, and this case is REMANDED for further administrative proceedings consistent with this opinion.

IT IS SO ORDERED.

DATED this _21_ day of NOVEMBER, 2013.

_Malcolm F. Marsh_
Malcolm F. Marsh
United States District Judge